SWIFT & COMPANY v. MABRY, ADMINISTRATOR.

4-6635                                          159 S. W. 2d 61

Opinion delivered February 23, 1942.

*Ohmer C. Burnside* and *Rose, Loughborough, Dobyns & House,* for appellant.

*W. W. Grubbs* and *J. R. Wilson,* for appellee.

GREENHAW, J. J. G. Mabry, administrator of the estate of Cloice Robertson, deceased, and J. R. Robertson, individually and as next friend for Oreda Robertson, a minor, brought suit against appellant in the circuit court of Chicot county for damages resulting from injuries they sustained in eating sausage which had been manufactured by appellant.

It was alleged that appellant was negligent in failing to discover that the sausage contained a poison or was so tainted that it was poisonous and dangerous to eat and wholly unfit for human consumption, in failing to discover the diseased condition of the slaughtered animal which produced the poisonous substance; in failing properly to prepare and handle the meat and inspect

same, or in selling it; in failing to disclose the poisonous nature to the retailer; and in placing the sausage in a faulty container which was not properly sealed so as to exclude air. Damages were prayed in the sum of $3,000 for each of the plaintiffs. Appellant's answer denied the material allegations of the complaint.

Upon a trial of the issues, verdicts were rendered by the jury for $1,800 in favor of the administrator of the estate of Cloice Robertson, $1,500 in favor of J. R. Robertson, individually, and $500 for him as next friend of Oreda Robertson. It is not contended that either of these verdicts is excessive. From an order overruling the motion for new trial, the case was appealed to this court.

The evidence showed that J. R. Robertson, with his wife and eight children, lived on a farm in Chicot county. Mr. and Mrs. Robertson went to Eudora on November 9, 1939, where they purchased a supply of groceries from J. H. Connerly, a retail merchant. Included was one six-pound can of "Swift's Sausage Packed in Vegetable Oil," this can being about the size of an ordinary one-gallon tin bucket. This can of sausage, together with five other cans constituting a case, was delivered to the retail merchant in Eudora from appellant's place of business at Greenville, Mississippi, on November 8, 1939. The cans were placed on top of a refrigerator in the store. The refrigerator was about 25 feet from the stove, and the temperature around the stove was about 60 degrees at that time, and it was freezing on the outside. They remained there until the can in question was sold and delivered to Mr. Robertson the next day. It was taken, with other groceries, to his home in the country and placed in an unheated room.

On Friday evening, November 10, the can of sausage was opened preparatory for use at the evening meal. Lamar Robertson, a son of J. R. Robertson, cut the can of sausage, and stated that when he stuck the can opener into the can there was a spewing noise and oil came out on top of the can after he had cut about one inch in the top. Mrs. Robertson heard the can spew, examined it, and, thinking that probably it was all right, placed some

of the sausage in a pan. After heating it, it was placed in a bowl and put on the table. In addition to the sausage, they had tomato soup, rice, biscuits, and gravy for supper.

The evidence showed that J. R. Robertson, Cloice Robertson, and Oreda Robertson all ate some of this sausage. Mrs. Robertson testified that the sausage did not taste right to her, and she did not eat it; it tasted like it was sour or tainted. Lamar Robertson ate a part of the piece of sausage he had taken on his plate, and remarked at the time that it did not taste right. "Q. Did you eat any of the sausage? A. I ate a piece of one of them. Q. What did you observe in the eating of the part of the piece you ate? A. They just didn't taste right to me. Q. Can you describe how it tasted that makes you say that? A. It tasted kind of sour like it was fixing to ruin. Q. What did you do with it? A. I just raked it back on the edge of my plate. Q. And what did you make your supper out of? A. Tomato soup and rice."

According to the evidence, J. R. Robertson and his two little girls, Oreda and Cloice, were the only members of the family who ate any appreciable amount of the sausage. There was no evidence that any other child even tasted the sausage, and Mrs. Robertson and Lamar barely tasted it and noticed it did not taste right and laid their pieces aside. Mr. Robertson did not detect anything wrong with it.

The sausage was eaten around 7 o'clock Friday night, and about daylight Saturday morning J. R. Robertson awakened with severe pains in his head and stomach and vomited the sausage and biscuits he had eaten. All through Sunday he continued to suffer pain and to vomit.

On Saturday morning Cloice got up and went to the kitchen and ate a piece of the sausage left from supper, and went back to bed and began vomiting. Oreda, about the same time the next morning, began vomiting. They all complained of pains in their heads and stomachs, and all vomited frequently. Mrs. Robertson testified: "The sausage and biscuit was in it (the vomit) and it looked plumb green. The watery looking stuff they were throw-

ing up was green looking''; that she gave them medicine she had in the house, such as salts, oil and soda water. They were all ill Sunday. On Monday morning Floyd Robertson was sent to Dr. Charles Leaverett for medicine, which was given to Mr. Robertson and the two children throughout Monday and Tuesday. The three were irrational at times.

On Wednesday morning, Floyd went for Dr. Leaverett, who arrived around 2 p. m. and examined Mr. Robertson and the two children. Cloice was sent to the hospital immediately. She was unconscious at the time, and her temperature was 101. She had muscular twitchings and was jerking all over. Mr. Robertson had a temperature of 102. His pulse was unusually fast, he was toxic and complained of severe headaches and abdominal pains. His eyes were glassy, and the vomit which he discharged at that time had the appearance of coffee grounds. Oreda complained of a severe headache and pains in her stomach. Her eyes were glassy, and she was extremely toxic. Her temperature was 102.2. Mr. Robertson and Oreda were sent to the hospital the next day.

In addition to the above description of their injuries, Dr. Leaverett stated that his diagnosis of their trouble was food poisoning, and it was his opinion that the sausage was the cause of their illness and of Cloice's death. Cloice died at the hospital Thursday evening, without regaining consciousness. Oreda and her father remained in the hospital for a week or more. Dr. Leaverett stated that Oreda and her father had malaria, but no laboratory test was made on Cloice for malaria.

The evidence further showed that after Mr. Robertson and Oreda returned home they were incapacitated for some time. He was totally disabled for a month and a half, and thereafter continued to suffer from the effects of the illness. Dr. Leaverett stated he did not know whether he would ever entirely recover, and he thought he had sustained some permanent injuries. Robertson claimed his eyesight had been damaged, and that at times he had a double vision. Oreda lost considerable weight. Robertson was 40 years of age, and his children, Oreda

and Cloice, seven and five years of age respectively, and were all in fairly good health at the time of the alleged food poisoning.

Dr. S. W. Douglas and Dr. E. P. McGehee testified as expert witnesses on behalf of appellees. In answer to a long hypothetical question propounded to them, they testified that in their opinions the illness of J. R. Robertson and his two children were brought about by food poisoning, and the death of Cloice Robertson was due to food poisoning.

A number of witnesses testified on behalf of appellant, showing the process and care used by appellant in the manufacturing of this kind of sausage, from the slaughtering of the animal through the canning of the sausage and its subsequent handling, in an endeavor to show that appellant had not been guilty of any negligence.

Dr. E. E. Barlowe, an expert witness on behalf of appellant, stated that in his opinion the illness of Robertson and his two children was not due to food poisoning, but due to malaria, and that the hospital records showed that Robertson and his daughter, Oreda, had some malaria. Dr. L. B. Jenson testified for appellant that in his opinion the illness and death were not caused by any kind of food poisoning.

In its motion for a new trial appellant assigns a number of errors for which it contends a reversal should be granted herein.

It is earnestly contended that the court erred in giving and refusing a number of instructions. We have carefully examined each of the instructions given and refused, for the giving and refusal of which the appellant has assigned error, and have reached the conclusion that no error was committed in this respect which was prejudicial and would warrant a reversal of this case.

Appellant also contends that the case should be reversed because of error in the wording of hypothetical question No. 1 propounded to expert witnesses on behalf of appellees. The question involved was a very long one. Appellant's objection thereto is that it incorrectly stated

material, undisputed evidence, and omitted essential undisputed evidence. While this hypothetical question might have been phrased by counsel for appellees in such a way as to more clearly express the evidence upon which it was predicated, we are unable to say that the wording of this question constituted reversible error under the evidence in this case. In other words, we do not think any prejudice resulted from the propounding of this question to witnesses. Further, appellant did not specifically object to the question on the ground that it omitted the evidence of malaria.

In the case of *Missouri Pacific Railroad Co.* v. *Hampton*, 195 Ark. 335, 112 S. W. 2d 428, this court said: "Besides, if appellants' counsel thought there were any facts omitted from the question which were essential to forming a conclusion, his remedy is to put those additional facts before the witness on cross-examination. 11 R. C. L., § 579, *et seq.* . . .

"Again, this court said: 'In propounding a hypothetical question to an expert witness, the data upon which it is based need not cover all of the facts which have been proved in the case. The party offering the testimony may select such facts as he conceives to have been proved, and predicate his hypothetical question thereon.' *Arkansas Midland Rd. Co.* v. *Pearson,* 98 Ark. 399, 135 S. W. 917, 34 L. R. A., N. S., 317."

Appellant contends that there was no substantial evidence of negligence which justified the submission of this case to a jury; that the court, therefore, erred in not directing a verdict for appellant, and the verdicts of the jury were based upon speculation and conjecture. We are unable to agree with this contention. In our opinion there was substantial evidence to submit to a jury, and from which a jury might reasonably infer that the illness of Robertson and his two children, and the death of his daughter, Cloice, was due to food poisoning; that the sausage in question was the cause of the food poisoning, and that it was tainted or poisonous and dangerous to eat as the result of the alleged negligence on the part of appellant.

We think this case is controlled by the case of *Armour & Company* v. *Drury*, 146 Ark. 310, 226 S. W. 133. In that case appellee's wife died, and the jury found that her death was brought about by eating sausage which contained a poisonous substance. In an opinion by Chief Justice McCulloch, this court said: "We think the testimony as a whole is sufficient to warrant a submission of the question of negligence to the jury. This is not building a presumption or an inference of fact upon a presumption, but the circumstances are such as fairly warrant the inference that Mrs. Drury ate the sausage, that the sausage contained a poison, and that it caused her sickness and death, and that appellee was negligent either in failing to discover the disease which produced the poisonous alkaloid or in failing to properly prepare or handle the meat, thereby causing it to become a poisonous substance.

"At the trial now under review appellant introduced an abundance of testimony, not only on the issue of care in the preparation and handling of the meat, but also on the issue as to the cause of the sickness and death of appellee's wife. Expert testimony was introduced by appellant tending to establish the fact that Mrs. Drury's illness was not attributable to poison from eating sausage or at least that the cause of her illness was so much a matter of conjecture that the inference was not reasonably warranted that it was caused by eating impure sausage. However, this testimony raised a conflict on that issue, and we cannot say that the verdict of the jury is unsupported by substantial evidence. . . .

"It is earnestly insisted that the verdict is not supported by sufficient evidence in that the testimony introduced by appellant as to the selection and preparation of meat is undisputed and shows that appellant exercised ordinary care and was not guilty of negligence. It is not correct, however, to say that the testimony on that issue is undisputed. There is, indeed, no direct contradiction of the narrative of facts given by the witnesses introduced by appellant as to the method of selecting and preparing the meat. There is an indirect contradiction by the testimony of appellee to the effect that the stick of

sausage of which his wife ate contained 'a green slimy piece about as big as your thumb' which was wet and soggy and gave out a bad odor—smelled like it was rotten. The jury could have rejected the testimony of appellee, but we must assume that they accepted it as true. The jury, notwithstanding the fact that the stick of sausage was impure, might have found that its condition was the result of accident and not necessarily of negligence, but the jury were not bound to so find from the testimony. Two of the witnesses introduced by appellant testified that the stick of sausage could not possibly be in the impure condition appellant claimed to find it in, after the meat was selected, prepared and handled according to the methods employed at appellants' packing house. This warranted the jury in finding, if they believed appellee's testimony, that he found the stick of sausage to be in the condition as related, that appellant did not observe the precautions stated by the witnesses in selecting and preparing the meat, and that there was negligence in one of these respects. This was, in other words, a circumstance which warranted the jury in finding that ordinary care was not observed by appellant. This made a substantial conflict in the testimony which it became the duty of the jury to settle. We cannot say, therefore, that there is not a legal sufficiency of testimony to sustain the verdict.''

Finally, appellant assigns as reversible error certain remarks of the trial judge made in response to a question propounded on cross-examination by counsel for appellant to one of the witnesses. The court permitted counsel to ask practically the same question immediately thereafter, and we do not think any prejudicial error resulted from the allegedly improper remarks of the court.

Finding no reversible error, the judgments are affirmed.